# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 5:18cr35-RH-MAL

ROBERT DONELSON,

      Defendant.

_____/


## ORDER DENYING THE § 2255 MOTION AND
## GRANTING A CERTIFICATE OF APPEALABILITY


    The defendant Robert Donelson is serving a 15-year sentence in the Bureau of Prisons. He has moved for relief under 28 U.S.C. § 2255. He claims his trial attorney rendered ineffective assistance by failing to investigate information a specific individual, Michelle Harvell, could have provided, and by failing to call her as a witness.[1] Mr. Donelson claims his appellate attorney rendered ineffective assistance, too, but that claim is unfounded for reasons set out in the magistrate judge's report and recommendation, ECF No. 104.

---

[1] Ms. Harvell is now known by her maiden name, Edwards. Her full name is Jeanny Michelle Edwards. This order uses Michelle Harvell, the name used at trial and in most of the relevant filings.

This order sets out the court's findings of fact and conclusions of law following an evidentiary hearing on the claim that the trial attorney rendered ineffective assistance.

## I. The arrest

On May 12, 2018, Mr. Donelson was driving a gray Ford Mustang that Ms. Harvell owned. He was alone; there were no passengers in the car. A backpack was in the passenger's seat.[2] The backpack held more than 50 grams of methamphetamine, scales, and a loaded handgun, as well as a laptop and iPad.[3]

Officers had warrants for Mr. Donelson's arrest. They blocked him in as he drove into a Harley Davidson parking lot. Mr. Donelson jumped out of the car, leaving it in drive.[4] He threw approximately $4,000 in cash into the air and ran.[5] His car rolled into an officer's car.[6] Officers chased down Mr. Donelson and interviewed him on site. They searched the car, seizing the backpack and its contents.

Mr. Donelson has never challenged these facts, even now, and has no basis to do so.

---

[2] Trial Tr., ECF No. 81 at 34.
[3] *Id.* at 34, 44, 125.
[4] *Id.* at 31, 51–52.
[5] *Id.* at 31, 34.
[6] *Id.* at 31, 33, 51.

## II. The trial attorney's pretrial assessment

A superseding indictment charged Mr. Donelson with three offenses: possessing with intent to distribute 50 grams or more of methamphetamine (count 1); possessing a firearm in furtherance of the methamphetamine offense (count 2); and possessing a firearm or ammunition as a convicted felon (count 3). His trial attorney was Federal Public Defender Randolph P. Murrell. He took over the defense from another attorney in his office, a member of the United States Army Reserves who was called to active duty.

Mr. Murrell interviewed Mr. Donelson several times, considered the prior attorney's notes of her interview of Mr. Donelson, considered the evidence the government was expected to introduce at trial, and concluded the jury was certain to find Mr. Donelson guilty of possessing the methamphetamine with intent to distribute (count 1) and possessing the firearm as a convicted felon (count 3).

Mr. Murrell told Mr. Donelson he would not concede guilt on counts 1 and 3 but would "talk about"—that is, affirmatively contest—only the charge of

possessing the firearm in furtherance of the drug offense (count 2).[7] Mr. Donelson

approved that strategy.[8]

In addition to uncontested evidence of the arrest as set out above, the

evidence included the following.

A confidential informant told officers Mr. Donelson would be driving a gray

Ford Mustang at a specified address.[9] Officers located a gray Ford Mustang parked

at a house in the same neighborhood and began watching.[10] After about an hour,[11]

Mr. Donelson walked out of the house carrying a backpack and put it in the

Mustang on the passenger side.[12] He drove to a second residence, carried the

backpack into the residence, stayed five to ten minutes, came back out carrying the

backpack, and again put the backpack in the Mustang on the passenger side.[13] He

returned to the first residence and stayed for about five minutes, again entering and

---

[7] Hr'g Tr. at 47. The hearing has not yet been transcribed, but a rough
transcript prepared in realtime has been used for citations in this order. When an
official transcript is prepared, the citations in this order will usually be accurate but
sometimes may be off by a page. It is unlikely any citation will be off by more than
a page. If it appears necessary or useful upon preparation of the official transcript,
a reference list may be filed matching this order's citations to the correct page
numbers.

[8] *Id*. (Mr. Murrell's testimony that he "thinks" Mr. Donelson approved the
strategy). It is more likely than not that the testimony, though qualified, is correct.
The finding is not essential to the outcome on the § 2255 motion.

[9] Trial Tr., ECF No. 81 at 26 –27.

[10] *Id.* at 27.

[11] *Id.* at 29.

[12] *Id.* at 27–28.

[13] *Id.* at 28–29.

exiting with the backpack.[14] Mr. Donelson left the neighborhood and drove to the

Harley Davidson store, where he was arrested.[15]

In a recorded post-*Miranda* interview on site,[16] Mr. Donelson was asked,

"What's in the car?" He answered, "There's some drugs."[17] The examiner told Mr.

Donelson officers had been watching him and he had gotten back into selling drugs

as soon as he got out of prison. Mr. Donelson responded, "I did."[18] When asked

whether the money he threw in the air was his "re-up money," he answered, "Yes

sir."[19] Mr. Donelson might also have answered "yes" when asked whether he got

the money from selling dope[20]; that was the officer's testimony, but at that point

the recording is significantly obscured by background noise.[21]

Officers took Mr. Donelson to the county jail. He placed a call on a recorded

line. From the context, it is clear he was speaking to a trusted acquaintance. Mr.

Donelson said he had been "set up" by Wendi—probably a reference to Wendi

Ware—who asked him to meet her at the Harley Davidson store.[22] Asked what he

was being charged with, Mr. Donelson said he did not know yet; he had "just

---

[14] *Id.* at 29.
[15] *Id.* at 29–32.
[16] *Id.* at 62.
[17] Gov't Tr. Ex. 18 at 05:30–05:35; Gov't Tr. Ex. 19 at 3.
[18] Gov't Tr. Ex. 18 at 05:37–05:46; Gov't Tr. Ex. 19 at 3.
[19] Gov't Tr. Ex. 18 at 06:20–06:24; Gov't Tr. Ex. 19 at 3.
[20] *See* Gov't Tr. Ex. 18 at 08:58–09:20.
[21] Trial Tr., ECF No. 81 at 64–65.
[22] Gov't Tr. Ex. 20 at 01:33–02:02; Gov't Tr. Ex. 21 at 1.

walked in the door."[23] In response to the question, "What'd you have on you?," Mr. Donelson answered, "in the book bag there's a pistol and ummm like 2 zips."[24] The reference to "2 zips" matched the two ounces of methamphetamine in the backpack.

In his § 2255 motion, Mr. Donelson says he learned of the 2 zips and pistol from earlier jail calls.[25] But there is no evidence of that, and the assertion seems inconsistent with Mr. Donelson's statement that he had just walked in the door. In any event, who could have told Mr. Donelson this? A person with pre-arrest knowledge of the drugs and gun would have been unlikely to tell an innocent Mr. Donelson about them in a jail call, and officers do not ordinarily tell an arrestee's acquaintances details about their evidence. Moreover, even if Mr. Donelson had told Mr. Murrell the information came from earlier jail calls, proving it at trial would have required putting Mr. Donelson on the stand—something Mr. Murrell did not believe was feasible.[26] The recorded, undeniable statement in the jail call was damning.

---

[23] Gov't Tr. Ex. 20 at 02:03–02:06; Gov't Tr. Ex. 21 at 1.
[24] Gov't Tr. Ex. 20 at 02:07–02:20; Gov't Tr. Ex. 21 at 1.
[25] *See* ECF No. 100 at 1.
[26] Hr'g Tr. at 46.

There was also evidence that five weeks earlier, Mr. Donelson ran from a car an officer attempted to stop for speeding.[27] A handgun and drugs were in the car.[28] This was admissible under Federal Rule of Evidence 404(b) to show Mr. Donelson's knowledge and intent at the time of the charged offenses.

In pretrial meetings with Mr. Murrell, Mr. Donelson pointed out disagreements with some of the government's expected evidence, asserting, for example, that he did not believe officers were in position to see him carry the backpack into houses and put it back in the car as they claimed. But Mr. Donelson never asserted he did not carry the backpack, put it in the car, or know what was in it.[29]

Any reasonable attorney would have shared Mr. Murrell's assessment that Mr. Donelson was certain to be convicted on counts 1 and 3, if not also on count 2.

### III. The trial proceeds without Ms. Harvell

Mr. Murrell knew Mr. Donelson had told his first attorney that the "backpack where the drugs and gun were found" belonged to Ms. Harvell.[30] Mr. Murrell did not attempt to contact Ms. Harvell—or to have his investigator do so—because he did not think testimony that she owned the backpack would make any

---

[27] Trial Tr., ECF No. 81 at 90–113.
[28] *Id.* at 99–102.
[29] Hr'g Tr. at 53.
[30] *Id.* at 60.

difference. The issue was possession of the drugs and gun, not ownership of the backpack or even of the drugs and gun. Mr. Donelson did not suggest to Mr. Murrell that Ms. Harvell could provide any other useful information.

The government included Ms. Harvell on a witness list served a few days before the trial.[31] Mr. Donelson told Mr. Murrell that Mr. Donelson wished to have Ms. Harvell called as a witness. In an email, Mr. Murrell asked the government's attorney not to release Ms. Harvell from the government's subpoena because "I would like to call her as a witness."[32] As it turned out, Ms. Harvell was detained in a county jail about 100 miles from the place of trial, and the government did not plan to have her transported. When the government rested, Mr. Murrell brought this to the court's attention:

> I did want to bring up one issue. Mr. Donelson had asked me about a witness, Michelle Harvell, that he thought was important to call. *He tells me that she could testify it was not his -- it was her backpack, it wasn't his.* I had sent Mr. Ahmed an email saying, "Well, if you've got her, don't excuse her, because I would like to call her as a witness." I talked to Mr. Ahmed just a second ago. He does not have her here as a witness. He tells me that he made some effort, but that Ms. Harvell was represented by a lawyer and had charges pending against her, and he was under the impression that she was essentially not available as a witness.

> It is something that does cause me some concern. I suppose we have to make judgment calls in all this. I know Mr. Donelson did tell me he wanted me to call her as a witness. I suppose I could ask the court for a continuance to try to get her here, but it does not

---

[31] *See* ECF Nos. 45 & 46.
[32] ECF No. 81 at 115.

sound to me that she's actually available. I don't know that from my standpoint that the testimony is that critical, that it was her backpack or his. It probably doesn't resolve anything. So I'm not going to ask the court for a continuance, but I did want the court to know of the circumstance.[33]

The government provided this further explanation of the circumstances:

> Ms. Harvell owned the Mustang. She was interviewed by law enforcement soon thereafter. She indicated that the drugs nor the firearm, neither of them, belonged to her. And so I wanted to call her as a witness.
>
> We were informed last week, the agent informed me, that she was in custody at Bay County. I contacted Bay County . . . . I left a message on Wednesday. . . .
>
> Now, Ms. Harvell, she actually gave an incriminatory interview against the defendant, indicating that the drugs did not belong to her; that she had loaned the vehicle to the defendant; and that the defendant had possession of the vehicle for at least two weeks. That interview was turned over back I think in October or November of last year to defense counsel.
>
> So I don't know what exculpatory information Ms. Harvell would provide to defense counsel. I would tell counsel that she is charged with an offense, and she's in custody, and I got no response from defense counsel. I did leave a message at the Bay County Public Defender's Office last Wednesday . . . .
>
> . . . .
>
> . . . [B]ased on the first interview, she would say it was not her backpack. Now, whether she's changed her mind, I don't know.[34]

This exchange followed:

---

[33] Trial Tr., ECF No. 81 at 115–16 (emphasis added).
[34] *Id.* at 116–18.

> THE COURT: . . . Mr. Murrell, what do you want to do?
>
> MR. MURRELL: Well, again, it's a judgment call. I'm not going to ask for a continuance. I suppose I could and try to get her here. But on balance, I don't think her testimony would be that significant.
>
> THE COURT: You've talked to Mr. Donelson about this?
>
> MR. MURRELL: Yes. He certainly wants me to call her as a witness; yes, sir.
>
> THE COURT: Your judgment is, not a need?
>
> MR. MURRELL: That's correct.[35]

Mr. Murrell added, "there is reason to believe that she wouldn't say anything that would help us."[36]

The discussion ended this way:

> THE COURT: . . . .
>
> Here's where we are:
>
> We will go [ahead] and finish this trial, but you can see what is coming. Mr. Donelson is going to complain that Mr. Murrell rendered ineffective assistance by not calling this witness. Sooner or later this witness is going to wind up testifying, it sounds like, or invoking the Fifth. . . . [W]e don't know right now that she's going to take the Fifth.
>
> . . . .

---

[35] *Id.* at 118.

[36] *Id.*

> I guess I can writ her and have her here tomorrow morning, but it doesn't sound like anybody particularly wants to call her as a witness, anyway.
>
> MR. MURRELL: No. My judgment is, I can't see where it would help us.[37]

The trial went forward. The jury returned a verdict convicting Mr. Donelson on all three counts. This was hardly surprising; the evidence of guilt on counts 1 and 3 was overwhelming, and the evidence of guilt on count 2, while not as overwhelming, was strong. Mr. Murrell's pretrial assessment that there was no chance of success on counts 1 and 3 was correct. He made a colorable argument for acquittal on count 2—the only chance of success—but that, too, was a long shot.

To be sure, Mr. Murrell contested the evidence to the extent he could. The officer who saw Mr. Donelson carry the backpack into and out of houses was some distance away. Mr. Donelson knew there were outstanding warrants so had a reason to flee even aside from the drugs and gun in the car. Parts of the audio recordings were hard to decipher. An unknown woman had called law enforcement claiming the iPad and laptop but had not followed up when told she would have to provide identification to get them back. None of this was likely to—or did—make a difference.

---

[37] *Id.* at 119–20.

## IV. The post-trial investigation

After return of the verdict, Mr. Murrell initiated a further investigation. New trial motions are difficult. Even so, it was possible, if unlikely, that Ms. Harvell would have new information that could still be useful.

Mr. Murrell's investigator Allison Rivera began by interviewing Ms. Harvell. She said she rented the Mustang to Reyna Davis the day before the arrest, Ms. Davis returned it, and Mr. Donelson picked it up from Ms. Harvell on the morning of the arrest. Ms. Harvell said Ms. Davis later called to say she left a backpack in the car.[38] Ms. Harvell said Mr. Donelson did not have the backpack when he picked up the car.[39]

Ms. Harvell also said she had been threatened by Mr. Donelson's girlfriend Janelle Lazano, who had learned Ms. Harvell had been subpoenaed or was on the government's witness list and wanted Ms. Harvell to help Mr. Donelson.[40]

Ms. Rivera next interviewed Ms. Davis, who said the backpack wasn't hers.[41]

Mr. Murrell talked to Mr. Donelson, who said he had a written statement from Ms. Lazano admitting the drugs and gun were hers.[42] Mr. Murrell sent Ms.

---

[38] Hr'g Tr. at 29, 57.
[39] *Id.* at 57–58.
[40] *Id.* at 29, 57.
[41] *Id.* at 30.
[42] *Id.* at 30, 57–58.

Rivera to interview Ms. Lazano, who said the backpack was indeed hers—that she had left it in the Mustang when Ms. Harvell gave her a ride a month earlier. Ms. Lazano said the backpack's contents included her laptop and tablet as well as methamphetamine, heroin, and a gun.[43]

This led Ms. Rivera back to Ms. Harvell, who said Ms. Lazano was lying—that Ms. Harvell had never given Ms. Lazano a ride.[44] Ms. Harvell said Ms. Davis and Wendi Ware had the Mustang the night before the arrest and that Ms. Ware—not Ms. Davis as Ms. Harvell said in Ms. Rivera's first interview—called to say she left her things in the car.

None of this had come out at trial—it was newly discovered evidence. A motion for new trial on this basis would have faced substantial obstacles, but Ms. Rivera talked to Mr. Donelson about it. He said he picked up the car at 4:30 p.m. on the day before the arrest—not on the morning of the arrest—and he did not wish to pursue it.[45]

Mr. Donelson's decision not to pursue this ended Mr. Murrell's investigation.

---

[43] *Id.* at 30–31, 57.
[44] *Id.* at 31.
[45] *Id.* at 31.

## V. Ms. Harvell's new story

Later, after Mr. Murrell's post-trial investigation ended, Mr. Donelson filed the § 2255 motion now before the court. Ms. Harvell provided affidavits in support of the motion and testified at the § 2255 hearing. She provided quite the tale, sometimes referred to in this order as "the new story." It is set out in the next four paragraphs. I credit none of it.

Ms. Harvell says she loaned the Mustang to Ms. Ware on the night of May 11, 2018—the night before Mr. Donelson's arrest. Ms. Ware returned the car to Ms. Harvell, apparently that night, and said it was skipping. Ms. Harvell contacted Mr. Donelson, either directly or through his brother—she has given inconsistent accounts[46]—and asked Mr. Donelson to come to her house to determine what was wrong with the car. Mr. Donelson's brother delivered Mr. Donelson to Ms. Harvell's house early on May 12, 2018, as she was getting ready for work. He took the car for a test drive.

After Mr. Donelson left with the car, Ms. Harvell received a call from Ms. Ware, who said she had left a backpack in the car. Ms. Ware did not tell Ms.

---

[46] *Compare* Govt's Hr'g Ex. 1 (ECF No. 97 at 31) (Ms. Harvell's affidavit stating she called Mr. Donelson) & Gov'ts Hr'g Ex. 2 (ECF No. 114-1) (same) *with* Hr'g Tr. at 3 (Ms. Harvell's testimony stating she contacted Mr. Donelson "[t]hrough his brother") & *id*. at 12 (Ms. Harvell's testimony that she contacted Mr. Donelson through his brother because she did not have Mr. Donelson's telephone number at that time).

Harvell what was in the backpack. Ms. Harvell called Mr. Donelson—she testified he had given her his phone number when he took the car[47]—and told him not to let the backpack out of his sight. She says she did this because the car could not be locked.

Mr. Donelson did not promptly return the car, so Ms. Harvell did not make it to work that day. After learning of the arrest, Ms. Harvell called Ms. Ware to ask what was going on, and Ms. Ware said the backpack held a computer, some drugs, and a gun.[48]

Ms. Harvell says she expected to be called as a witness at Mr. Donelson's trial, and had she been called, she would have provided precisely this story.

It bears emphasis: although interviewed twice by Ms. Rivera during the post-trial investigation, Ms. Harvell said nothing about the Mustang's locks being broken or telling Mr. Donelson not to let the backpack out of his sight—assertions at the heart of the § 2255 motion. And the new assertion that it was Ms. Ware's backpack is inconsistent with Mr. Donelson's statement to his original attorney that the backpack belonged to Ms. Harvell.

A side note: Ms. Harvell testimony at the § 2255 hearing about when she was interviewed and by whom was mistaken. She was interviewed by a law

---

[47] Hr'g Tr. at 12.
[48] *Id.* at 12–13.

enforcement officer early on but did not remember it. It is clear, though, that an

interview occurred; the government's attorney would not have listed Ms. Harvell

as a witness had an officer not spoken to her, and the attorney reported to Mr.

Murrell and later to the court what Ms. Harvell had said. Ms. Harvell correctly

testified she was interviewed twice by a woman—the context makes clear this was

Ms. Rivera—but Ms. Harvell said this occurred before trial, not after. This mistake

is understandable; at the time of trial, Ms. Harvell was detained in another county

on unrelated charges, and it is not clear she knew, or had any way of knowing,

when Mr. Donelson's trial occurred. There were also inconsistencies in what Ms.

Harvell told Ms. Rivera and what she now says she told Ms. Rivera, but this, too, is

understandable; individuals who make up stories rather than tell the truth

sometimes have difficulty remembering what they said on prior occasions.

## VI. The standards governing ineffective-assistance claims

To prevail on an ineffective-assistance claim, a defendant must meet a two-

part test:

> First, the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors so serious that
> counsel was not functioning as the 'counsel' guaranteed the defendant by
> the Sixth Amendment. Second, the defendant must show that the
> deficient performance prejudiced the defense. This requires showing that
> counsel's errors were so serious as to deprive the defendant of a fair trial,
> a trial whose result is reliable. Unless a defendant makes both showings,
> it cannot be said that the conviction or death sentence resulted from a
> breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).

There are countless decisions trumpeting the deference due a defense attorney's judgment and strategy decisions in investigating and presenting a case. *See id.* at 690–91; *see also Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000). An attorney need not be right, just diligent. *See Chandler*, 218 F.3d at 1313.

## VII.  The absence of deficient performance

Mr. Murrell's pretrial assessment of the case was accurate. He was correct that there was no chance of success at trial on counts 1 and 3. A law enforcement officer saw Mr. Donelson carry a backpack in and out of houses for as little as five minutes—activity consistent with drug transactions—and saw him place the backpack in the car he was driving. When officers blocked his car, Mr. Donelson jumped out with the car still in drive, threw roughly $4,000 in cash into the air, and fled. He was apprehended and, in a recorded interview, admitted there were drugs in the car. Later, in a recorded telephone call from jail, he said at the time of the arrest he was in possession of two zips—slang for ounces—and a gun. Faced with this evidence, the strategic decision to contest only count 2, which carried a mandatory consecutive sentence, provided the best chance to achieve the best possible result. Or so an effective attorney could reasonably conclude.

An effective attorney could also reasonably conclude, as Mr. Murrell did, that there was no need to interview Ms. Harvell. *See Chandler*, 218 F.3d at 1318 ("And counsel need not always investigate before pursuing or not pursing a line of defense."). Mr. Donelson had said only that she would say the backpack was hers. As Mr. Murrell correctly concluded, ownership of the backpack was not an element of the offense and would make little difference. In interviews with Mr. Murrell, Mr. Donelson had not denied carrying the backpack into and out of residences, knowing its contents, and making the recorded statements acknowledging possession of the drugs and gun.

Mr. Donelson's silence of course was not evidence the government could present or the jury could consider—but it was part of what *Mr. Murrell* could properly consider. *See Chandler*, 218 F.3d at 1318 ("Because the reasonableness of counsel's acts (including what investigations are reasonable) depends critically upon information supplied by the petitioner or the petitioner's own statements or actions, evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims.") (cleaned up). Had there been any innocent explanation for the presence of the backpack in the car, Mr. Donelson would have provided it to Mr. Murrell, and Mr. Murrell would have investigated and tried the case accordingly.

This background, without more, was enough to support Mr. Murrell's strategic decision not to go further with Ms. Harvell. But there was more: she had been interviewed by law enforcement, reportedly saying Mr. Donelson had had the car for two weeks and that the drugs and gun were not hers. The government's attorney said, without contradiction, that he "turned over" that interview to Mr. Murrell months before trial.[49] The record does not indicate whether the interview was recorded or, if not, how it was turned over. But in any event, Mr. Murrell had no reason to doubt that an officer was available to testify to these statements, even if there was no recording.

In sum, Mr. Murrell had no reason to believe Ms. Harvell had information that could help the defense. He stuck to his plan to contest count 2 as vigorously as possible and not to undermine that effort by frivolously contesting counts 1 and 3. *See Chandler*, 218 F.3d at 1319 ("Stacking defenses can hurt a case. Good advocacy requires winnowing out some arguments, witnesses, evidence, and so on, to stress others."). An attorney who strives to win a difficult case does well to preserve all the credibility the attorney can muster—to appear to the jury as forthright and professional as possible. *See id.*

To be sure, asking for a continuance until the next morning would have risked little. The jury would not have known the reason for the delay. A burden

---

[49] Trial Tr., ECF No. 81 at 117.

would have been imposed on jurors who would have had to come back for another day of trial and on other participants in the process, including the officers who would have had to transport Ms. Harvell starting well prior to dawn. Mr. Murrell's decision not to impose these burdens without a reason was commendable. But had there been any significant chance of a benefit to Mr. Donelson, these burdens would have been borne without complaint.

An attorney's performance of course must be evaluated as of the time of the performance, not with the benefit of hindsight. *Strickland*, 466 U.S. at 689. We could all win the lottery if we could pick the numbers after they are known. When Mr. Murrell decided not to ask for a continuance so that Ms. Harvell could be brought to trial, Mr. Murrell had no reason to believe there was any significant chance her testimony would provide a benefit.

Mr. Murrell's decision not to seek a continuance was not deficient.

## VIII.  The absence of prejudice

I find as a fact that the new story—the assertion that Ms. Ware left the backpack in the car and Mr. Donelson carried it in and out of houses without knowing its contents because it belonged to someone else and the car would not lock—was fabricated. I do not credit Ms. Harvell's testimony.

Even so, to show prejudice as required on the ineffective-assistance claim, Mr. Donelson does not need to establish that the new story is true. He must show

instead that (a) an effective attorney would have learned of the story, (b) an

effective attorney who learned of the story would have presented it to the jury, and

(c) doing so would have created a reasonable probability of a different result—a

probability sufficient to undermine confidence in the outcome. *See, e.g.*,

*Harrington v. Richter*, 562 U.S. 86, 104 (2011). Mr. Donelson falls short in all

three respects.

### A. Learning the new story

Although the evidence is disputed, the record supports the conclusion, and I

find as a fact, that an effective attorney would not—indeed, could not—have

learned the new story, even had Ms. Harvell been interviewed in advance or

transported to the trial. The reason is that Ms. Harvell concocted the story *after the*

*trial*.

Two circumstances make this clear.

First, when initially interviewed by Ms. Rivera, Ms. Harvell said Ms. Davis

called Ms. Harvell to say she had left a backpack in the car.[50] In the next interview,

Ms. Harvell said Ms. Ware—not Ms. Davis—called to say she left her things in the

car. Ms. Harvell said not a word in either interview about the locks being broken or

telling Mr. Donelson not to let the backpack out of his sight. Had that part of the

---

[50] Hr'g Tr. at 56–59.

story been true or even concocted by that time, Ms. Harvell would have told the story to Ms. Rivera. She did not.

Second, had the story been concocted by the time of trial, Mr. Donelson probably would have known it. And had Mr. Donelson known the story at the time of trial, he surely would have told the story to Mr. Murrell. He did not.

Because Mr. Murrell would not have learned the new story even had he interviewed Ms. Harvell before or during trial, the failure to do so caused no prejudice.

### B. *Presenting the new story*

The new story, if true, would provide an innocent explanation for some of the evidence. But the story fails to account for additional evidence, including Mr. Donelson's unexplained brief visits to houses and his own incriminating statements. And the story does not change the analysis of Mr. Donelson's attempt to flee. He had a suspended license and other warrants, and there may have been a small amount of marijuana in plain view in the car, but possession of a distribution quantity of methamphetamine and a gun would provide a much stronger incentive to flee. Nothing says innocence quite like fleeing from an unsecured car while throwing thousands of dollars into the air.

An effective attorney could reasonably have chosen not to present the story even had it been available. The story was farfetched, had little chance of success,

and would have reduced the chance of success on count 2—the only real chance Mr. Donelson had of minimizing his sentence.

At the § 2255 hearing, Mr. Murrell testified he would not have presented the new story even had he learned of it before or at trial.[51] The distorting effect of hindsight makes it difficult to be sure what one would have done with knowledge of circumstances that were in fact unknown. But I credit Mr. Murrell's testimony that he would not have presented the new story. More importantly, I conclude that an effective attorney reasonably could have chosen not to present that story.

### C. Confidence in the outcome

Presenting the new story at trial would not have changed the result. *See Strickland*, 466 U.S. at 694. Nor is the possibility of a different outcome sufficient to undermine confidence in the verdict. The evidence of Mr. Donelson's guilt was overwhelming. The new story is so farfetched it would not have affected the analysis.

The new story purported to show Mr. Donelson did not know the drugs and gun were in the backpack—to show he was innocent of all the charges. But if the story had been presented at trial and if, as was almost certain, the jury had nonetheless found Mr. Donelson guilty on counts 1 and 3, the story would not have affected the analysis on count 2 at all.

---

[51] Hr'g Tr. at 35, 36–37.

In asserting the new story provided a viable defense, Mr. Donelson emphasizes the undisputed evidence that a woman called law enforcement claiming ownership of the iPad and laptop and asking for their return. This was proven at trial, even without the new story, and would have supported the new story had it been presented. But this is not nearly as persuasive as Mr. Donelson now asserts.

The critical issue was not who owned the backpack, iPad, or laptop, but whether Mr. Donelson knowingly possessed the drugs and gun. The iPad and laptop were valuable, and it is not surprising that someone wanted them. That a woman called asking about them—but did not follow up—might show nothing more than that Mr. Donelson was using someone else's backpack to transport his drugs, perhaps even a backpack inadvertently left in the car by a prior user. Or it might show a woman was involved in the drug business with Mr. Donelson. Or it might show a woman was willing to call on Mr. Donelson's behalf seeking return of his iPad and laptop. Indeed, the record now suggests that a woman—Mr. Donelson's girlfriend Ms. Lazano—was willing to claim ownership of the drugs and threaten a witness. The jury convicted Mr. Donelson despite the evidence that someone called law enforcement claiming the iPad and laptop; it is likely the jury also would have convicted him even had the new story been presented.

In short, the failure to present the new story does not undermine confidence in the verdict on counts 1 and 3 because the evidence on those counts—including some evidence the new story did not account for—was overwhelming. There is no significant chance the jury would have credited the new story and thus found Mr. Donelson did not know the drugs and gun were in the backpack. And if, as the jury was almost sure to find, Mr. Donelson knew about the drugs and gun, the new story would not have affected the further analysis on count 2—the only count on which Mr. Donelson had any colorable defense.

The failure to present Ms. Harvell's testimony at trial caused no prejudice.

## IX. Certificate of appealability

A defendant may appeal the denial of a § 2255 motion or 28 U.S.C. § 2254 petition only if the district court or court of appeals issues a certificate of appealability. Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell*, 537 U.S. 322, 335-38 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *see also Williams v. Taylor*, 529 U.S. 362, 402-13 (2000) (setting out the standards applicable to a § 2254 petition on the merits). The standards that apply to certificates of appealability on § 2255 motions and § 2254 petitions are the same.

As the Court said in *Slack*:

> To obtain a COA under § 2253(c), a habeas prisoner must
> make a substantial showing of the denial of a constitutional
> right, a demonstration that, under *Barefoot*, includes
> showing that reasonable jurists could debate whether (or, for
> that matter, agree that) the petition should have been
> resolved in a different manner or that the issues presented
> were "adequate to deserve encouragement to proceed
> further."

529 U.S. at 483-84 (quoting *Barefoot*, 463 U.S. at 893 n.4).

Mr. Donelson has made the required showing only the claim that Mr. Murrell provided ineffective assistance by failing to investigate or present Ms. Harvell's testimony. This order grants a certificate of appealability on that issue.

## X. Conclusion

Mr. Donelson has shown neither deficient performance nor prejudice. He was convicted because the evidence of guilt was overwhelming. He is not entitled to relief on the claim that his trial attorney rendered ineffective assistance. For the reasons set out in this order on the claim relating to Ms. Harvell and otherwise in the report and recommendation,

IT IS ORDERED:

1. The magistrate judge's report and recommendation, ECF No. 104, is accepted in part.

2. The 28 U.S.C. § 2255 motion, ECF No. 97, is denied.

3. A certificate of appealability is granted on the issue whether the defendant is entitled to relief based on his trial attorney's alleged ineffective assistance in

failing to investigate information a specific individual, Michelle Harvell, could

have provided, and by failing to call her as a witness.

SO ORDERED on January 20, 2025.

s/Robert L. Hinkle
United States District Judge